**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sixto Roberto RIOSECO,**
**Defendant–Appellant.**

**No. 87–5289.**

United States Court of Appeals,
Eleventh Circuit.

May 17, 1988.

---

Robert A. Herce, J. Thomas Wright, Tampa, Fla., for defendant-appellant.

Leon B. Kellner, U.S. Atty., Steven E. Chaykin, Linda C. Hertz, Barbara A. Ward, Andrea M. Simonton, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before FAY and VANCE, Circuit Judges, and HOFFMAN,* Senior District Judge.

PER CURIAM:

Appellant Sixto Roberto Rioseco appeals his conviction on two counts of violations of the Lacey Act, 16 U.S.C. secs. 3372 and 3373. On appeal he contends first, that the Lacey Act is unconstitutional in that it incorporates foreign law, thereby delegating legislative power to foreign governments and second, that the trial court erred in denying Rioseco's motion to suppress statements made before Rioseco was read his *Miranda* rights. Because we find that both of appellant's arguments are without merit, we affirm the conviction.

In April 1986 the Coast Guard cutter *Shearwater* was on routine patrol north of the Cay Sal Bank area of the Bahamas, an area of the high seas that the United States acknowledges to be within the Bahamas' exclusive economic zone.[1] The *Shearwater* observed the fishing boat, the *Jesuchristo*, seemingly engaged in fishing operations in that area. In line with its duty of enforc-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. "[T]he exclusive economic zone (EEZ) is a 200 nautical mile zone extending from a coastal State's baseline in which the coastal State has priority of access to living resources and exclusive right of access to non-living resources." Comment, *The Exclusive Economic Zone: Its Development and Future in International and Domestic Law*, 45 La.L.Rev. 1269, 1270 (1985). The Bahamas, however, claim an exclusive fishery zone of 200 nautical miles from their baseline. *See* Fisheries Resources Jurisdiction and Conservation Act of 1977, sec. 5. Because the United States also claims an EEZ extending 200 miles from its base line, *see* Proclamation No. 5030, 48 Fed.Reg. 10,605 (March 10, 1983), this, of course, causes a conflict because far less than two hundred miles separates some of the Bahamian islands from some points of the Florida coast. The usual practice in such cases where a relatively small distance separates two nations is the equal division of the area by a line equidistant from the two baselines. In such a situation, however, and in the absence of a treaty, the Bahamas claim an exclusive fishery zone to within twelve miles of the other nation's baseline. *See* Fisheries Resources Jurisdiction and Conservation Act of 1977, sec. 11(2)(a). Because appellant Rioseco was arrested for fishing in an area that is concededly within the Bahamian EEZ, whether one recognizes the customary method to delineate the EEZ or the broader exclusive fishery realm claimed by the Bahamas, any lack of accord between the United States and the Bahamas on EEZ and fishing rights is irrelevant to this case.

ing various United States laws pertaining to narcotics, fishing and safety, the Coast Guard stopped and boarded the *Jesuchristo*. Appellant Rioseco answered a series of routine questions, identifying himself as the master of the vessel and stating that he had been fishing in the area for some three days. Coast Guard officers informed appellant that possession of a Bahamian fishing license was necessary to fish in those waters and that failure to possess such a license would render such fishing a contravention of the United States Lacey Act. During this initial boarding, American officials conducted routine safety and administrative checks of the ship and issued a civil citation for violation of the Lacey Act. Afterwards, the Coast Guard departed, having ordered Rioseco to pull up his fish traps and to return to Key West.

Several hours later the Coast Guard made radio contact with the United States Attorney and with the National Marine Fisheries Service in Miami and discovered that this was appellant Rioseco's fourth violation of the Lacey Act. It was decided that the appellant should not only face a civil citation, but also criminal prosecution for his violations of the Lacey Act. The Coast Guard cutter caught up with the *Jesuchristo*, and guardsmen boarded it a second time. Appellant Rioseco was ar-

rested and informed in English and Spanish of his *Miranda* rights. The *Jesuchristo*, with a Coast Guard officer aboard, was returned to Key West (its home port) where its fish cargo was sold for fair market value.

At the time of Rioseco's trial, the district court held a hearing to determine whether statements that Rioseco had made during the first Coast Guard boarding should be suppressed. The court concluded that Rioseco had not been in custody at that time for *Miranda* purposes, so that any statements he made were admissible.

Appellant-defendant's first trial ended in a hung jury. At his second trial, appellant was convicted of possession with intent to sell and of attempt to import and to transport in foreign commerce fish worth in excess of $350, knowing that such fish were taken in violation of Bahamian law. *See* 16 U.S.C. secs. 3372 and 3373.

## I. *Constitutionality of the Lacey Act*

■ In the Lacey Act, Congress has made it an offense against United States law to possess or to import fish and wildlife taken in violation of the law of foreign nations.[2] Appellant contends that this incorporation of foreign law is an unconstitutional delegation of legislative power.[3]

---

**2.** Title 16 U.S.C. sec. 3372 reads

It is unlawful for any person—
(1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;
(2) to import, export, transport, sell, receive, acquire or purchase in interstate or foreign commerce—
(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law, or
(B) any plant taken, possessed, transported or sold in violation of any law or regulation of any State;
(3) within the special maritime and territorial jurisdiction of the United States (as defined in section 7 or Title 18)—
(A) to possess any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law or Indian tribal law, or

(B) to possess any plant taken, possessed, transported, or sold in violation of any law or regulation of any State;
(4) having imported, exported, transported, sold, purchased, or received any fish or wildlife or plant imported from any foreign country or transported in interstate or foreign commerce, to make or submit any false record, account, label, or identification thereof; or
(5) to attempt to commit any act described in paragraphs (1) through (4).
Section 3373 sets out the civil and criminal penalties for violations of section 3372.

**3.** Appellee United States asserts that having failed to assert this claim before the district court, appellant Rioseco is precluded from raising it on appeal. Because the record will support an argument that appellant touched upon this improper delegation point before the district court, we will reach the merits of appellant's claim on this issue.

Appellant's contention is neither original nor meritorious. The Eighth Circuit rejected a challenge to the Lacey Act's constitutionality on this ground in 1910. *See Rupert v. United States,* 181 F. 87, 90–91 (8th Cir.1910) ("The act of Congress is valid wherein it is declared that the shipment out of the [state] territory in violation of the [state] territorial law constitutes a crime under national law."). More recently both the Third and the Sixth Circuits also have rejected the idea that the Lacey Act delegates authority to state or foreign governments. *See United States v. Molt,* 599 F.2d 1217, 1219 n. 1 (3d Cir.1979) ("Defendants' objections to the constitutionality of the Lacey Act ... are patently frivolous. The Act does not delegate legislative power to foreign governments, but simply limits the exclusion from the stream of foreign commerce to wildlife unlawfully taken abroad. The illegal taking is simply a fact entering into the description of the contraband article, just as if importations of wine or automobiles were restricted to bottles bearing an official foreign designation of *appellation controllee* or cars bearing indicia of a foreign safety inspection. Congress could obviously exercise its plenary power over foreign commerce in such a manner if it so chose."); *United States v. Bryant,* 716 F.2d 1091, 1094 (6th Cir.1983) (adopting *Molt* rationale to find no unconstitutional delegation to states where wildlife taken in violation of state law is involved), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *see also United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) (federal law making a federal crime those acts or omissions committed in federal enclave which would be a crime if committed in jurisdiction in which enclave is found held to be constitutional: no unconstitutional delegation of Congressional power is involved).

Legislative history to the most recent Lacey Act amendments further indicates that the Act involves no delegation of power. Congress stated its concern with the environmental and economic effects of the illegal wildlife trade, *Senate Rep.* No. 123, 97th Cong., 1st Sess. 1–4 (1981) *reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1748–51, as well as its desire to encourage state and foreign governments in their protection of wildlife and plants. *Id.* at 3–4. To accomplish the dual purpose of eliminating this illegal trade and of protecting wild flora and fauna, Congress has made it a United States crime to take, to sell, or to transport wildlife taken in violation of any foreign law relating to wildlife. *Id.* at 5–6. Congress, itself, has set out the penalties for violation of these Lacey Act provisions. 16 U.S.C. sec. 3373. Thus, Congress has delegated no power, but has itself set out its policies and has implemented them. As the Third Circuit noted, the element of illegal taking in violation of foreign law is a characteristic by which we are to distinguish wildlife properly in the stream of commerce from wildlife that Congress has excluded from commerce. The Lacey Act thus grants no power to foreign governments to assume Congress's legislative authority.

For the above reasons, appellant's constitutional challenge to the law under which he was convicted is without merit.

## II. *Applicability of Miranda*

■ Appellant contends that the district court erred in failing to suppress appellant's statements to the Coast Guard during the initial boarding, before appellant was alerted to his *Miranda* rights. The district court's determination involves a mixed question of fact and law. While we must defer to the district court's factual findings, if not clearly erroneous, and view the evidence adduced at the suppression hearing in the light most favorable to the government, *see United States v. Baron–Mantilla,* 743 F.2d 868, 870 (11th Cir.1984), we give plenary review to the application of law to the facts. *See Adams v. Balkcom,* 688 F.2d 734, 739 (11th Cir.1982). We conclude that the district court correctly determined that appellant was not in custody during the initial boarding; *Miranda* warnings were therefore unnecessary, and the statements were admissible.

This circuit has long recognized that the Coast Guard's routine stop, boarding and

inspection of an American vessel on the high seas does not normally rise to the level of custodial detention thus requiring *Miranda* warnings. *See United States v. Jonas*, 639 F.2d 200, 204 (5th Cir. Unit B 1981); *United States v. Gray*, 659 F.2d 1296 (5th Cir. Unit B 1981).

Appellant contends first, that neither initial boarding nor the questioning of defendant was routine because probable cause clearly existed for arrest under the Lacey Act and second, that the defendant, under the circumstances, could have reasonably believed himself to be in custody. Appellant emphasizes the facts that, having seen traps in the water, live fish on the ship, and crew dressed in fishing gear, the Coast Guard boarded not as a matter of routine, but already believing probable cause to exist for an arrest under the Lacey Act; that five armed Coast Guard officers boarded the *Jesuchristo;* that defendant and other crewmembers were ordered to remain in the fantail area of the boat and were not free to leave; that a Coast Guard officer elicited statements, which later proved to be incriminating and prejudicial to defendant, about defendant's fishing activities prior to asking the one decisive question about appellant's possession of a Bahamian fishing permit.

This circuit has recognized that the Supreme Court recently reiterated that the custody analysis for *Miranda* purposes is narrow: "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir.1987) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984)).

Rioseco was not in custody during the initial boarding and questioning. Appellant-defendant was not told that he was in custody or under arrest. The mere fact that Coast Guard officers were armed and

that *Jesuchristo* personnel were gathered in one specific area of the boat during the routine search of the boat subsequent to boarding could not lead a reasonable man to believe that he was in custody. The Coast Guard action was simply routine procedure in a usual boarding action.

Appellant also contends that the Coast Guard official's routine questions were actually posed to obtain incriminating information. Appellant cites this court's opinion in *United States v. Glen–Archila*, 677 F.2d 809, 816 n. 16 (11th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982), for the proposition that answers to investigative questions asked in the guise of routine questioning are inadmissible if the suspect has not been alerted to his *Miranda* rights. Appellant misapplies *Glen–Archila* to his own situation. The Coast Guard official testified that at no time during the initial stop did he intend to hold Rioseco for criminal prosecution under the Lacey Act. The Coast Guard observed a boat apparently engaged in fishing activities, approached the boat to determine its registry, and once having determined it to be an American vessel, conducted a routine boarding and inspection to determine compliance with American law. There is no evidence in the record that the Coast Guard deliberately used a routine questioning process to obtain information prejudicial to defendant rather than for the usual routine purposes.

We conclude that the district court did not err in refusing to suppress statements by Rioseco made to the Coast Guard during the initial boarding.

For the above reasons, appellant's conviction is AFFIRMED.