**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert Waites GUTHRIE,
Defendant–Appellant.**

No. 93–6508.

United States Court of Appeals,
Eleventh Circuit.

April 24, 1995.

George M. Boles, Weaver, Boles & Elmore, Birmingham, AL, for appellant.

Richard H. Loftin, U.S. Atty., Mobile, AL, Jonathan F. Klein, U.S. Dept. of Justice/Appellate Section, Environment & Natural Resources, Washington, DC, Vivian Vines (State of Alabama) Office of the Atty. Gen., Montgomery, AL, for appellee.

Before CARNES and BARKETT, Circuit Judges, and JOHNSON, Senior Circuit Judge.

CARNES, Circuit Judge:

Robert Waites Guthrie pleaded conditionally guilty to charges that he took, possessed, sold, and transported Alabama red-bellied turtles (*Pseudemys alabamensis*) in violation of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA"), and that he conspired to sell alligator snapping turtles (*Macroclemys temminicki*) in violation of the Lacey Act Amendments of 1981, 16 U.S.C. §§ 3371 *et seq.* ("Lacey Act"). Consistent with the conditional nature of his guilty plea, *see* Fed.R.Crim.P. 11(a)(2), and with the issues he preserved in the district court, Guthrie challenges the validity of his prosecution under the Lacey Act for violation of Alabama regulations that make it unlawful to sell alligator snapping turtles without a permit: he contends that the Lacey Act is an unconstitutional delegation of federal legislative authority; and that the state regulations that formed the basis for his prosecution were promulgated under state laws that violate the Alabama Constitution. Guthrie also challenges the validity of the Secretary of the Interior's listing of the Alabama red-bellied turtle as an endangered species.

## I. BACKGROUND

The charges against Guthrie involve two different turtle species, and we will address the facts and procedural history for each species separately. Because Guthrie's conditional guilty plea eliminated the need for a trial, the factual information that follows is

drawn primarily from the briefs, the transcript of the conditional guilty plea proceeding, and from the presentence investigation report, which was adopted by the district court at the sentencing hearing.

## A. STATEMENT OF FACTS

### 1. Facts Relating to the Alligator Snapping Turtles

An Alabama regulation makes it unlawful to take, capture, kill, possess, sell or trade alligator snapping turtles without a permit. Ala.Admin.Code r. 220–2–.92 (1990). On July 11, 1990, an undercover agent working for the Department of the Interior telephoned Guthrie and offered to sell him a forty-five pound alligator snapping turtle. Guthrie declined to buy the proffered turtle because, as he explained later, it was only good for "butcher meat." However, Guthrie told the agent that a man named Arthur Ipson would buy turtles that size.

Two days later, the agent sold the alligator snapping turtle to Ipson for fifty cents a pound. Ipson told the agent that he sometimes would sell turtles weighing over 120 pounds to Guthrie at two dollars a pound, and that Guthrie had contacts in Japan to whom Guthrie would sell turtles for up to $5,000 each.

On July 28, an agent came to Guthrie's house to offer him additional alligator snapping turtles. In that conversation, Guthrie outlined his arrangement to sell turtles weighing at least 165 pounds to buyers in Japan. He also described how he created false paper trails in order to buy alligator snapping turtles. Guthrie told the agent that because sale of these turtles is illegal in Alabama, the agent should sell them to Wayne LaFluer[1] at LaFluer Seafood and Fish Market ("LaFluer Seafood") in Ville Platte, Louisiana. Wayne LaFluer would then sell the turtles to Guthrie in Louisiana, so that all documentation would reflect Louisiana as the place of original sale; such sales are legal in Louisiana. In describing this arrangement, Guthrie proclaimed: "[The]

law is not stopping me, it's just inconveniencing me."

On August 17, 1990, the undercover agents went to the address Guthrie had given for LaFluer Seafood in Ville Platte, Louisiana, to sell alligator snapping turtles. At LaFluer Seafood, the agents told a James Carol LaFluer that the alligator snapping turtles came from Alabama, where they were banned from capture. Nevertheless, James Carol LaFluer bought the illegal turtles. He confirmed to the agents that Wayne LaFluer usually bought turtles for resale to Guthrie, who would then sell the large turtles to his contacts in Japan.

### 2. Facts Relating to the Alabama Red-bellied Turtles

During the July 28, 1990, conversation at his house in which Guthrie and the undercover agent discussed alligator snapping turtles, Guthrie also asked if the agent could provide him with Alabama red-bellied turtles. The Alabama red-bellied turtle is listed as an endangered species under the Endangered Species Act. Guthrie told the agent where to find such turtles and how to identify them, and said he would pay five dollars for small turtles and twenty-five dollars for large female ones. Explaining that he bought Alabama red-bellied turtles and their eggs from a collector, Guthrie boasted that he already had 800 turtles and eggs in incubation. Guthrie described his plan to buy up the remaining wild population of Alabama red-bellied turtles, then apply for a government grant to reintroduce the Alabama red-bellied turtle into the wild from his own private stock. This conversation led undercover agents to include the Alabama red-bellied turtle in their investigation of Guthrie and his cohorts.

On August 16, 1990, agents met with Guthrie and a man named Steven Stroupe in Alabama and sold Guthrie and Stroupe three Alabama red-bellied turtles. The agents covertly made a videotape on this occasion of Guthrie giving advice on capturing Alabama red-bellied turtles and on evading the Game

---

**1.** We cannot ascertain from the record whether Wayne LaFluer is the correct name for this individual, who is also referred to as "Wayne Louis Meyer," "Wayne Louise Meyer," and "Wayne Lewis Myers" in various places in the record and the briefs.

and Fish officials. Guthrie told the agents what would happen if officials caught them with either Alabama red-bellied turtles or alligator snapping turtles in their possession.

An undercover agent telephoned Guthrie again on September 11, 1990. The agent claimed to have captured several turtles, including two Alabama red-bellied turtles. Guthrie arranged to meet with the agent the next day in south Alabama. On September 12, 1990, the agent met with Stroupe and Guthrie and sold Guthrie a turtle that an endangered species biologist had identified as an Alabama red-bellied turtle. Guthrie again was covertly videotaped as he described his long-term goal of eradicating Alabama red-bellied turtles in the wild. He explained that the government knew that he had obtained an unidentified number of Alabama red-bellied turtles before the turtle was added to the endangered species list; Guthrie could legally possess those original turtles. He told the agent that as long as the Fish and Wildlife Service did not discover that he had been illegally adding to his collection, he could hope to make $25,000 by helping the government restock Alabama red-bellied turtles in the wild: "If they ... decide to start releasing them, where can they get captive-raised turtles? They can't buy them from me either, but they can pay me a grant to raise them."

## B. PROCEDURAL HISTORY

Guthrie was charged in five counts of a seven count superseding indictment that also named Ipson, Stroupe, James Carol LaFluer, and Wayne Louis Meyer. Guthrie initially pleaded not guilty to the charges.

### 1. The Alligator Snapping Turtles Count

One count against Guthrie related to the alligator snapping turtle sales and purchases. It charged that Guthrie and others conspired, in violation of 18 U.S.C. § 371, to sell and purchase alligator snapping turtles obtained in Alabama, in violation of Alabama Nongame Species Regulation 220–2–.92 and of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B). Guthrie filed a motion to dismiss the indictment, contending that no valid Alabama law or regulation prohibited

the purchase and sale of alligator snapping turtles, and that the Alabama regulation purporting to do so was adopted under the authority of a statute which itself was adopted in violation of the state constitution. The district court "carried with/to trial" Guthrie's motion to dismiss "based on the issue that the Alabama Regulation is not valid."

### 2. The Alabama Red-bellied Turtles Counts

The remaining four counts against Guthrie related to Alabama red-bellied turtles. These counts charged Guthrie with taking, possessing, selling, and transporting Alabama red-bellied turtles in violation of the Endangered Species Act, 16 U.S.C. §§ 1538(a)(1)(B), 1538(a)(1)(D), and 1538(g); with soliciting others to do the same, 16 U.S.C. § 1538(g); and with conspiracy to engage with others in these actions, 18 U.S.C. § 371. Guthrie initially filed a motion to dismiss the counts, contending that the Alabama red-bellied turtle is not a pure species but a hybrid, and that the ESA does not protect hybrids. Guthrie then filed an additional motion to dismiss, supplementing with additional scientific publications his argument that the Alabama red-bellied turtle is not a species. Guthrie also filed two pretrial motions requesting that the district court authorize a DNA study to determine whether the Alabama red-bellied turtle is a hybrid or a pure species. In these motions, Guthrie offered to pay part of the costs of a study and to participate in the DNA testing, but he wanted to retain the right to author, publish, or co-publish the study's results.

The district court denied Guthrie's motion for the scientific study because the study would be too costly and because the court thought that Guthrie should not assist in its preparation. Initially, the court "carried with/to trial" the motions to dismiss based upon Guthrie's claim that the Alabama red-bellied turtle's listing was invalid, but in December of 1991 it expressly denied the motion to dismiss insofar as it related to the Alabama red-bellied turtle counts, holding that the Fish and Wildlife Service did not act arbitrarily or capriciously when it promulgated the regulation. The district court also

rejected Guthrie's offer to present new DNA evidence, because judicial review of the issue would have been limited to the agency record; the court noted that the evidence at issue was not even available at the time the Secretary of the Interior added Alabama red-bellied turtles to the endangered species list.

### 3. The Conditional Guilty Plea and Appeal

On December 16, 1991, Guthrie changed his plea to a Federal Rule of Criminal Procedure 11(a)(2) conditional guilty plea. The district court approved the plea as conditioned on Guthrie's right to appeal the following issues: whether the district court erred in excluding DNA evidence, in finding that the Alabama red-bellied turtle is a valid species, and in holding that evidence relating to the existence of the Alabama red-bellied turtle as a species would have been inadmissible at trial; whether the Commissioner of the Alabama Department of Conservation had authority to promulgate rules protecting the alligator snapping turtle, and if so, whether that authority was valid under the state constitution; and whether Congress could have delegated to state regulatory agencies the power to create a federal felony, or if it could have transformed a state violation or misdemeanor into a federal felony.[2]

Guthrie filed an appeal, which this Court dismissed because Guthrie had not received a sentence and therefore had no final judgment from which to appeal.

Back in the district court, before sentencing, Guthrie filed an additional discovery request relating to the Alabama red-bellied turtle counts. In that request, Guthrie claimed that a Texas A & M study, one which he apparently co-authored, had been completed that showed "beyond peradventure . . . that the animal described in the indictment is in fact a mongrel or amalgamation of

many species." Guthrie asked for permission to test the actual turtles involved in the case in order to sample their DNA. The district court denied the request and sentenced Guthrie to thirteen months in prison, with three years supervised release. The court also ordered Guthrie to pay $150 in special assessments and $5,000 in the form of either a fine or, alternatively, a donation to the Alabama Department of Conservation or the United States Department of the Interior for the preservation of the Alabama red-bellied turtle. Guthrie appealed.

## II. DISCUSSION

We first consider Guthrie's Lacey Act contentions, and then his Endangered Species Act contention.

### A. THE ALLIGATOR SNAPPING TURTLES COUNT: THE LACEY ACT ISSUES

According to Guthrie, there are two reasons why the district court should have dismissed the part of the indictment that charged him under the Lacey Act for conspiracy to sell and purchase alligator snapping turtles. First, Guthrie contends that the Lacey Act improperly transforms "state misdemeanors into federal felonies," because Congress cannot constitutionally delegate to a state the authority to create federal crimes. Second, Guthrie contends that the Lacey Act charges should have been dismissed because the state regulation that protects alligator snapping turtles was promulgated pursuant to a statute adopted in violation of the state constitution. These claims present questions of law for our *de novo* review. *See United States v. Osburn,* 955 F.2d 1500, 1503 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 223, 121 L.Ed.2d 160 & —— U.S. ——, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992). Both contentions lack merit.

However, because the district court approved reservation of issues relating to Guthrie's motion to dismiss the alligator snapping turtle counts, and the government does not object, we will proceed as though Guthrie did receive an adverse determination of his motion to dismiss those counts of the indictment.

---

**2.** It is questionable whether Guthrie has a right to appeal the alligator snapping turtle issues, because the only ruling the district court made regarding Guthrie's motion to dismiss the alligator snapping turtle counts was to carry them "with/to trial." We doubt that such a ruling was an "adverse determination of any specified pretrial motion," which Rule 11(a)(2) requires.

### 1. The Unconstitutional Delegation Challenge

The Lacey Act makes it unlawful to deal in "any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C.A. § 3372(a)(2)(A) (West 1985). The Act provides criminal penalties for trade in protected animals whose value exceeds $350, *see* 16 U.S.C.A. § 3373(d)(1)(B) (West 1985 & Supp.1994); the value of the alligator snapping turtles involved in this case exceeded that amount. Guthrie's prosecution under the Lacey Act was dependent upon an underlying state nongame species regulation, Ala.Admin.Code r. 220–2–.92 (1990), which prohibits the taking, capture, killing, or offering to sell or trade of alligator snapping turtles. *See* Ala.Admin.Code r. 220–2–.92(1)(c) (1990).

Guthrie argues that the Lacey Act prosecution is void because Congress has unconstitutionally delegated to states the legislative authority to create federal felonies. Because Congress has no power over the state agencies, Guthrie claims, it cannot deliver criminal authority to those agencies. This argument is foreclosed by our decision in *United States v. Rioseco*, 845 F.2d 299, 302 (11th Cir.1988), which upheld the constitutionality of the Lacey Act provisions insofar as they enforced foreign law. Necessary to that result was the reasoning that the Act's enforcement provisions "involve[ ] no delegation of power." *Id.* Following that reasoning, we conclude that the Lacey Act does not unconstitutionally delegate federal legislative authority to states or their agencies.

### 2. The Constitutionality of the Underlying State Regulation

Guthrie contends that his Lacey Act conviction must be reversed because the Alabama regulation listing the alligator snapping turtle as a protected species was adopted pursuant to state statutes that are invalid under the Alabama Constitution. He argues that all of the Alabama statutes authorizing the Commissioner of Conservation and Natural Resources to administer laws protecting wild animals violate § 45 of the Alabama Constitution, which provides:

> Each law shall contain but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes . . . .

Ala. Const. of 1901, art. IV, § 45. According to Guthrie, the titles of the authorizing statutes do not sufficiently reflect the content of those laws, and one of the authorizing acts also violates the single subject requirement. Because the alligator snapping turtle regulation was promulgated in a manner that violates the state constitution, he argues, the regulation cannot form the state law basis for a Lacey Act prosecution.

As a threshold matter, Guthrie's position is dependent upon the proposition that a Lacey Act defendant in federal court can defeat the charge against him by demonstrating that the state regulation listing a species as protected is invalid under *state* law. While the question is an interesting one, we need not reach it because the regulation is plainly constitutional.

 Regulation 220–2–.90 cites as statutory authority §§ 9–2–7, 9–2–8, and 9–2–12 of the Alabama Code, and 1982 Alabama Acts 82–424. The three code provisions in turn derive from three different acts. According to Guthrie, the three code provisions violate the Alabama Constitution because their titles as reported in the Michie codification of the Alabama Code do not match the substance of those provisions. However, the Code of Alabama itself clearly states that the headings provided by Michie are not the titles of acts: "the descriptive headings or catchlines immediately preceding or within the text of the individual sections of this Code . . . do not constitute part of the law . . . ." Ala.Code § 1–1–14(b) (1975). Instead, we must look to the underlying acts to determine whether the titles of the acts comply with § 45 of the Alabama Constitution.

 We need only determine that one of the acts providing the commissioner with authority to promulgate the regulation is constitutional in order to hold that Regulation 220–2–.92 is valid. For the reasons that

follow, we hold that 1943 Alabama Acts 531 ("Act No. 531") meets the clear expression requirement of § 45 of the Alabama Constitution and is valid.[3] Under Act No. 531, the Commissioner (then referred to as "Director") of Conservation and Natural Resources:

> is authorized to make and promulgate such reasonable rules and regulations not in conflict with the provisions of the game and fish laws as he may deem for the best interest of the conservation, protection, and propagation of wild game, birds, animals, fish, and sea foods, which rules and regulations shall have the effect of law
> . . . .

1943 Alabama Acts 531. By its plain language, this act gives the Commissioner the power to promulgate regulations relating to the protection of wild animals, including the alligator snapping turtle.

The title of Act No. 531 is: "To amend Section 21, Title 8, Code of Alabama 1940." That is precisely what Act No. 531 does—it amends Title 8, § 21, Code of Alabama 1940, which authorized the Commissioner to promulgate certain rules and regulations. The Supreme Court of Alabama has held that a bill that purports to revise or amend a particular code section violates the single subject or clear expression requirements of § 45 of the Alabama Constitution only if the act's subject matter is not "germane" to the code section it seeks to amend. *Opinion of the Justices. No. 121,* 256 Ala. 29, 53 So.2d 583, 584 (1951). The same test applies to laws already enacted. *See Baggett v. Webb,* 248 So.2d 275, 283–84 (Ala.Civ.App.), *cert. denied,* 287 Ala. 725, 248 So.2d 284 (1971); *cf. Holcombe v. Pierce,* 253 Ala. 173, 43 So.2d 640, 642 (1949) (holding provisions of act whose title indicates it amends entire code chapter need only be germane to chapter as whole).

Applying the holdings of the Alabama Supreme Court, we find that Act No. 531 is plainly valid because its provisions are germane to the section of the code that it amends. Act No. 531 amends only § 21 of

Title 8 of the 1940 Alabama Code; it does so by adding a limitation preventing the Commissioner from promulgating regulations that interfere with dams and certain other private water uses. This added limitation is clearly germane to the subject of the Commissioner's powers to promulgate conservation regulations and does not go beyond the scope of the code provision it amends.

Act No. 531 therefore does not violate § 45 of the Alabama Constitution. Its provision regarding the promulgation of regulations is codified in § 9–2–8 of the current Alabama Code, which provides that the Commissioner of Conservation and Natural Resources:

> is authorized to make and promulgate such reasonable rules and regulations not in conflict with the provisions of the game and fish laws as he may deem for the best interest of the conservation, protection and propagation of wild game, birds, animals, fish and seafoods, which rules and regulations shall have the effect of law . . . .

Ala.Code § 9–2–8 (1975). Because Act No. 531 does not violate § 45 of the Alabama Constitution, Alabama Code § 9–2–8 is valid, and Alabama Reg. 220–2–.92, which cites § 9–2–8 as one of its sources, is likewise valid. We need not address the validity of the remaining statutes, since Act No. 531 is itself sufficient authority for the regulation. By rejecting the state law invalidity predicate of Guthrie's claim, we do not reach the issue of whether a viable state law challenge to the underlying regulation would be a defense to a Lacey Act prosecution. Nor do we imply any view on that question.

## B. THE ALABAMA RED–BELLIED TURTLES COUNTS: THE ENDANGERED SPECIES ACT ISSUES

The Secretary of the Interior ("the Secretary") has authority under the ESA to promulgate a list of endangered and threatened species to be protected under the Act. *See* 16 U.S.C.A. § 1533 (West 1985).[4] The ESA

---

**3.** Guthrie does not contend that Act No. 531 violates any other provision of the Alabama Constitution, such as the single subject requirement.

**4.** The Secretary of the Interior shares authority with the Secretary of Commerce, with each being authorized to list different animals. *See* 16

U.S.C.A. § 1532 (West 1985). With the general exception of marine animals, most species (including the Alabama red-bellied turtle) fall within the authority of the Secretary of the Interior, who has delegated that authority to the Fish and Wildlife Service. *See* 48 Fed.Reg. 29,990, 29,997

defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C.A. § 1532(6) (West 1985), and "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(20) (West 1985). In July 1986, the Secretary proposed listing the Alabama red-bellied turtle as a threatened species. 51 Fed.Reg. 24,727 (1986). Eleven months later, he adopted a regulation listing the turtle as an endangered species. 52 Fed.Reg. 22,-939 (1987). During the process, the Secretary changed the status of the turtle from threatened to endangered, and he did so in response to one of the public comments received in support of the turtle's protection. *Id.* at 22,941. Neither Guthrie nor anyone else submitted any public comments opposed to listing the turtle. *See id.*

The ESA provides a petition process for agency review, *see* 16 U.S.C.A. § 1533(b)(3)(A) (West 1985 & Supp.1994), and it also authorizes citizen suits to challenge whether the Secretary has met his duties under the act. 16 U.S.C.A. § 1540(g) (West 1985). In the seven years since the regulation listing the Alabama red-bellied turtle as an endangered species was adopted, neither Guthrie nor anyone else has attempted to have the regulation reviewed by either of these authorized means. Instead, having willfully violated the regulation, Guthrie now seeks to collaterally attack its validity in this criminal proceeding. Guthrie's sole defense to the charge that his conduct violated the ESA is that the Alabama red-bellied turtle is not a species, that the Secretary therefore lacked the authority to list it as an endangered species, and that as a result, the ESA does not entitle the Alabama red-bellied turtle to protection.

1. **The Scope of Review in a Collateral Challenge to the Agency Regulation**

 ▮ The extent, if any, to which Guthrie can collaterally attack in his criminal prose-

cution the regulation listing the Alabama red-bellied turtle as an endangered species is a question of law, which we review *de novo*. *See United States v. Osburn,* 955 F.2d 1500, 1503 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 223, 121 L.Ed.2d 160 & —— U.S. ——, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992). Although no Eleventh Circuit precedent addresses this issue, other decisions suggest that collateral review of an agency regulation in a criminal proceeding should be narrow or nonexistent. In two cases involving criminal prosecutions for activities involving species protected under the Migratory Bird Treaty Act, federal courts have declared that "where [the Secretary] has promulgated facially valid regulations [under the Migratory Bird Treaty Act] we do not think that a defendant in a criminal case can collaterally attack them." *United States v. Gigstead,* 528 F.2d 314, 317 (8th Cir.1976); *see also United States v. Darst,* 726 F.Supp. 286, 287 (D.Kan. 1989) (same).

The Supreme Court applied a narrow review to regulations in a criminal prosecution under the Clean Air Act, when it allowed criminal defendants to challenge whether the Administrator of the EPA had authority to promulgate emission standards under the language of the statute. In *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978), the Court reviewed the Administrator's action but limited its review to the question of whether the promulgated regulation could be considered an "emission standard":

> The narrow inquiry to be addressed by the court in a criminal prosecution is not whether the Administrator has complied with appropriate procedures in promulgating the regulation in question, or whether the particular regulation is arbitrary, capricious, or supported by the administrative record.... The question is only whether the regulation which the defendant is alleged to have violated is on its

(1983); *see also* 50 C.F.R. § 402.01(b) (1993); Reorganization Plan No. 4 of 1970, *reprinted in* 1970 U.S.C.C.A.N. at 6326. Because the Fish and Wildlife Service is part of the Department of the Interior and thus under the Secretary's con-

trol, for simplicity's sake we refer to the Secretary, even though the Fish and Wildlife Service actually took the administrative actions in question.

face an "emission standard" within the broad limits of the congressional meaning of that term.

*Adamo,* 434 U.S. at 285, 98 S.Ct. at 573. The language of the Clean Air Act limits *Adamo's* applicability, however, because the statute expressly prohibited review of the Administrator's emission standard promulgations in any criminal or civil proceedings for enforcement. *See* Clean Air Act, Pub.L. No. 91–604, § 307(b), 1970 U.S.C.C.A.N. (84 Stat. 1676) 1954, 1994 (current version codified at 42 U.S.C. § 7607(b)(2)). As the ESA has no such preclusive language, *Adamo* is distinguishable.

The *Adamo* decision therefore does not answer the question of whether the scope of review applicable to regulations listing animals as endangered species under the ESA is narrower when the regulations are collaterally attacked in a criminal proceeding than the scope of review would be on direct review of those same regulations. We need not decide that question either, because its answer is not essential to the disposition of this case. Even assuming that the scope of collateral review is as broad as the scope of direct review, the regulation in this case must still be upheld.

### 2. The Limitation of the Scope of Review to the Agency Record

■ When directly reviewing an agency decision or regulation, a court does not consider any evidence that was not in the record before the agency at the time that it made the decision or promulgated the regulation. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.") (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)).

■ Under the Administrative Procedure Act, the only "agency action" available for our review is the Secretary's 1987 decision to list the Alabama red-bellied turtles as an endangered species. *See* 5 U.S.C.A. § 704 (West 1977) (allowing judicial review of "agency action made reviewable by statute

and final agency action for which there is no other adequate remedy in a court"). The DNA study Guthrie sought to have considered by the district court was never presented to the Secretary. In fact, to this day, Guthrie has never presented the Secretary with any evidence or argument that the Alabama red-bellied turtle is not a species. At the time of the rulemaking, Guthrie could have petitioned for further review. 16 U.S.C.A. § 1533(b)(3)(A) (West 1985). Even after the type of DNA analysis Guthrie touts emerged as a new scientific tool, Guthrie made no attempt to have the Secretary change the regulation listing the turtle as a species, nor did he attempt to challenge the listing in any way until he was caught engaging in the criminal conduct that led to this prosecution.

As a result, the Secretary has never had an opportunity to view Guthrie's DNA study, let alone to undertake any "agency action, finding[ ] ... [or] conclusion[ ]" regarding the validity of that study or its possible impact on the decision to list the Alabama red-bellied turtle as an endangered species. 5 U.S.C.A. § 706 (West 1985). Permitting a challenge to an agency regulation on the grounds of new scientific evidence to be made collaterally in a criminal prosecution would deprive the courts of the expertise of the administrative agency, and would prevent the agency from fulfilling its function.

Guthrie did not seek to change the agency regulation. He chose to violate the law. We will not reward that choice by allowing him to bypass the agency and receive judicial review of the regulation in light of the new DNA study. Instead, Guthrie at most is entitled to the same review he would have received had he sought direct review of the agency regulation at the time it was promulgated. Such review is limited to the evidence before the agency at that time.

### 3. The Application of an Arbitrary and Capricious Standard to Review of the Agency Regulation

■ On direct review of the Secretary's decision to list the Alabama red-bellied turtle as an endangered species, we would hold that decision unlawful only if we found it to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1977).[5] This arbitrary and capricious standard applies to the Secretary's finding that "[t]he Alabama red-bellied turtle is considered to be a valid species." 52 Fed.Reg. 22,939 (1987); 51 Fed. Reg. 24,727 (1986). Having reviewed the sources and studies cited by the Secretary in support of this finding, we conclude that the Secretary did not act arbitrarily or capriciously when he found the Alabama red-bellied turtle to be a valid species.

In its proposed regulation, the Secretary acknowledged that "[t]he taxonomic status of this turtle has been questioned ... and questions still remain regarding its relationships with other members of the Pseudemys rubriventris group, specifically the Florida red-bellied turtle ...." 51 Fed.Reg. 24,727 (1986). The Secretary then cited two texts by the same herpetologist questioning the taxonomic status of the species. *Id.* In the final regulation, the Secretary listed six other texts in support of his finding that the Alabama red-bellied turtle is nevertheless a valid species. 52 Fed.Reg. 22,939 (1987). The eight texts cited by the Secretary reflect the scientific history behind the Secretary's conclusion that the Alabama red-bellied turtle is a separate species.

The Alabama red-bellied turtle was first classified as a species with the name "*Pseu-*

*demys alabamensis*" by a herpetologist named Baur in 1893. *See* 52 Fed.Reg. 22,939 (1987). In the 1930s, another herpetologist named Archie Carr authored an article and a book questioning whether the Alabama red-bellied turtle was a species. In the article, Carr concluded that *Pseudemys alabamensis* was not a species but likely "a mutant occurring in [*Pseudemys*] *mobiliensis* and *suwanniensis.*" A.F. Carr, Jr., *A New Subspecies of Pseudemys Floridana, with Notes on the Floridana Complex,* 1938 Copeia 105, 109 n. 6. In the book, Carr catalogued the morphological traits of several species from the *floridana* group of turtles before stating that "it seems nearly certain that another Gulf coast turtle known to herpetologists for the last fifty years as *P. alabamensis,* and characterized by having a deep notch and toothlike cusps at the tip of the upper jaw, is really just a variant form that occurs with apparently equal frequency among [two different subspecies of turtle in the family Emydidae]." Archie Carr, *Handbook of Turtles: The Turtles of the United States, Canada, and Baja California* 280 (1952).

Five years after his book was published, Carr changed his position in an article he co-authored with John W. Crenshaw, Jr.[6] Carr and Crenshaw explained that in reaching his earlier conclusion that the Alabama red-bellied turtle was not a species, Carr had examined specimens of the turtle from New Or-

5. Under the Administrative Procedure Act, courts can hold unlawful:
 agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 5 U.S.C.A. § 706(2) (West 1977). We apply the "arbitrary and capricious" standard because it is the most relevant to the issues Guthrie preserved on appeal.

6. Carr and Crenshaw's article is one of the six texts cited by the Secretary in support of the species designation. *See* Archie Carr & John W. Crenshaw, Jr., *A Taxonomic Reappraisal of the Turtle* Pseudemys Alabamensis *Baur,* The Bulletin of the Florida State Museum, Biological Sciences, Aug. 15, 1957, at 25. The other five are: (1) Peter C.H. Pritchard, *Encyclopedia of Turtles* (1979); (2) Joseph P. Ward, *Relationships of Chrysemyd Turtles of North America (Testudines: Emydidae),* 21 Special Pub. Museum Tex.Tech.U. 3 (1984); (3) C.J. McCoy and Richard C. Vogt, *Distribution and Population Status of the Alabama Red-bellied Turtle,* Pseudemys alabamensis (Dec. 10, 1979), Report on U.S. Fish and Wildlife Service Contract No. 14–16–0004–79–038; (4) Robert H. Mount, *The Reptiles and Amphibians of Alabama* (1975); and (5) James L. Dobie, *Distribution and Status of the Alabama Red-bellied Turtle,* Pseudemys Alabamensis *Baur* (1985), Report on U.S. Fish and Wildlife Service Contract No. 14–16–0009–1546.

leans, Mobile, and Crystal River in Florida, and had observed that they exhibited characteristics of other turtles in those areas. *See* Carr & Crenshaw, *supra* note 6, at 31. Carr and Crenshaw then distinguished the Alabama red-bellied turtle from *Pseudemys floridana* based on different morphological characteristics from the ones Carr had noted previously, especially the presence of head markings in the shape of a pre-frontal arrow. *See id.* at 31. The herpetologists also suggested that at least one of Carr's Crystal River turtles may have been misidentified. *Id.* They concluded that the Alabama red-bellied turtle was indeed a separate species, despite its apparent intergradation with two different groups of emydid turtles. *See id.* at 41.

Since Carr and Crenshaw's publication, the authors of five other books and studies cited by the Secretary have agreed that the Alabama red-bellied turtle, *Pseudemys alabamensis,* deserves separate species status. *See, e.g.,* Pritchard, *supra* note 6, at 133; Ward, *supra* note 6, at 43. Some of these scientists have concurred in this status even while noting that unresolved taxonomic questions remain. *See, e.g.,* McCoy and Vogt, *supra* note 6, at 1–3 ("*Pseudemys alabamensis* ... is a large, robust emydine turtle of the *Pseudemys rubriventris* group," but "the question of subspecific relationships remains open."); Mount, *supra* note 6, at 286 (1975) ("Based on information currently available, I concur in Carr and Crenshaw's treatment of *alabamensis* as a species within the *rubriventris* group, but consider its occurrence outside Alabama problematical.").

The final study relied upon by the Secretary was published just two years before the Secretary's decision. It reclassifies some of the turtle specimens labeled *Pseudemys alabamensis* by Carr and Crenshaw, and finds that the Alabama red-bellied turtle is a "valid species" that "is endemic to Alabama." Do-

bie, *supra* note 6, at 9. After trapping twelve rivers and the lakes on one island, *id.* at 7, Dobie found Alabama red-bellied turtles only along the Mobile River system, suggesting that earlier studies which found the Alabama red-bellied turtle as widely spread as Texas and Florida had misidentified the examined turtles. *Id.* at 10–11. Dobie and the later sources thus re-affirmed the resurrected species status of *Pseudemys alabamensis,* the Alabama red-bellied turtle.[7]

■ Given scientific support from numerous herpetologists, the Secretary did not act arbitrarily or capriciously when he listed the Alabama red-bellied turtle as an endangered species. This circuit is "highly deferential" to an agency's consideration of the factors relevant to its decision. *Hussion v. Madigan,* 950 F.2d 1546, 1553 (11th Cir.1992). The Secretary noted that the Alabama red-bellied turtle's status had indeed been questioned in the past, and thus he did not "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Nor was the Secretary's finding "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Having examined the articles, studies, and books relied upon by the Secretary when he concluded that the Alabama red-bellied turtle is a separate taxonomic species, we are satisfied that, despite the absence of total agreement within the scientific community, his finding is entirely reasonable. It certainly is not arbitrary or capricious.

### III. CONCLUSION

Guthrie's collateral attack upon the Alabama regulation protecting alligator snapping turtles fails, because it is clear that the state regulation is valid. Guthrie's collateral

---

7. Included in Dobie's list of factors contributing to the decline of the Alabama red-bellied turtle was the presence of commercial collectors who "justified their collecting of *alabamensis* by stating that the species could become extinct, so 'get them now' and sell them, or the laws will eventually restrict the selling of the animal ... (see attached price list)." Dobie, *supra* note 6, at 22.

Interestingly, the attached price list bears the name and address of "Robert W. Guthrie." *Id.* at Appendix B. Dobie also happens to note that two individuals he interviewed explained "that they could raise the individuals, breed them, and have some to release when the species becomes extinct in the wild." *Id.* at 22.

challenge to the Secretary's regulation designating the Alabama red-bellied turtle as an endangered species likewise fails, because the federal regulation withstands even the scope of review applicable to direct review of agency regulations. Guthrie's convictions regarding both turtle species are therefore AFFIRMED.